DANIEL B. HUNNICUTT, *Appellee*, v. ELIHU J. OREN *et ux.*, *Appellants*.

No. 16,824.

SYLLABUS BY THE COURT.

1. CONVEYANCES — *Consideration* — *Resulting Trust.* Where a grantee accepts title to land, without any consideration therefor, under an agreement with the grantor to hold it for her, and without any fraudulent intent, a trust results.

2. LIMITATION OF ACTIONS—*Resulting Trust—Suspension of the Statute.* Where a trust results by implication of law, a recognition by the trustee of the rights of the equitable owner tolls the running of the statute of limitations until the holder of the legal title disavows the trust.

Appeal from Douglas district court. Opinion filed April 8, 1911. Affirmed.

*W. B. Brownell, Jay A. Hindman,* and *Edward T. Riling,* for the appellants.

*S. D. Bishop, A. C. Mitchell,* and *J. H. Mitchell,* for the appellee.

The opinion of the court was delivered by

SMITH, J.: After the elucidation of the old rule of this court (No. 10a) in *Railway Co. v. Conlon,* 77 Kan. 324, followed by the enactment of section 576 of the

code of 1909 and the frequent criticisms and sugges-
tions made by this court in various cases, it would
seem unnecessary again to advert to the subject.  How-
ever, it becomes necessary to do so in this case.  The
appellants present an alleged abstract of 419 pages; it
would more properly be called a transcript.  A fair
abstract of less than one-third the size of the one pre-
sented would much better have presented the questions
to be considered.  We have observed that the appel-
lants did, in the space of about one page, abstract a
part of the evidence of one witness.  The appellee, how-
ever, not content with this, filed a counter abstract of
substantially the same matter, covering ten pages.
The so-called counter abstract covers 123 pages, much
of which is a transcript, with slight variations from
that given by the appellants.  The parties are in about
equal fault, and neither seems to have a very full com-
prehension of the title, "Abstract," which they have
given to their respective books.  Section 576 of the
code provides:

"The appellant shall serve on the appellee, or his at-
torney of record, an abstract of so much and such parts
of the pleadings, record, evidence and proceedings in
the case as he deems necessary for the consideration of
the court, and the appellee may, within thirty days
thereafter, serve on the appellant or his attorney a
further abstract containing any other matter deemed
by the appellee essential to the consideration of the
merits of such cause, and may also challenge the cor-
rectness of any matter contained in the appellant's
abstract."

Volume 3 of the Cyclopedia of Law and Procedure,
page 78, states the general rules for the preparation of
abstracts, which statement is set forth and approved
in *Railway Co. v. Conlon,* supra.  A reading of the stat-
ute indicates that the pleadings in an action should be
abstracted.  All formal parts, including the title, the
verification and filing marks, should generally be
omitted, as well as separate paragraphs in the body of

the pleadings not involved in the assignment of errors.

In abstracting the evidence the questions may usually be omitted, unless error is assigned on a ruling thereon. The evidence as detailed by the answers of the witnesses may be given in narrative form, but reference should be made to the record, and the substance of the evidence and not conclusions as to what it proves should be given. Evidence not pertaining to the issues on appeal should also be omitted. A careful reading of rule 9, as now numbered, and of the statute will furnish a definite and specific guide to follow.

A general outline of the facts, as found by the court, is as follows: Daniel B. Hunnicutt and Rebecca S. Oren were married in 1867, and thereafter moved to the state of Missouri. Neither seems to have been possessed of much property, and both engaged for a time in teaching. He inherited $5000 from his father's estate, and in 1876 bought a 53-acre tract of land in Missouri, which he paid for principally out of his inheritance. Not long thereafter the title to this land was transferred from him, through another, to his wife. In 1882 the family moved to Lawrence, and he bought a small residence property, which was paid for out of the money derived from his farming operations in Missouri. In 1883 he bought 305 acres of land near Lawrence, being the land now in dispute, for $6000, of which $1800 was paid in cash from the sale of the Missouri land, and a mortgage was given for the balance. The title to this land was taken in the name of Mrs. Hunnicutt. For years thereafter Hunnicutt and wife occupied both the farm and the town property, the wife remaining in Lawrence much of the time to enable the daughter to go to school. In 1888 an agreement by letter was made to sell the 305 acres of land to appellant Elihu J. Oren for $8000. The purchaser was to assume a mortgage for $3000, and pay the balance in cash. At the written request of Oren, Hunnicutt and wife executed a deed to the land to Oren and placed it

in the custody of a Mr. Blair, at Lawrence, who was not authorized to deliver it, but was to hold it a reasonable time to await the consummation of the sale, and, if the sale failed, to return the deed. Oren later declined to consummate the purchase, but Mrs. Hunnicutt got the deed from Blair and caused it to be recorded. On the day Hunnicutt discovered that this deed had been recorded he met his wife and her brother, Oren, on the street and demanded that the title should be placed back as it was before the deed was recorded, and was then advised by Oren that he disclaimed any ownership of the land. Thereafter Hunnicutt and wife continued to operate the farm as before, leasing portions of it and farming other portions. The leases were made in the name of Oren and signed by Mrs. Hunnicutt, as his agent. The appellee was advised that this was necessary because the record title was in Oren. Hunnicutt made some improvements on the property and ditched some land, and, on one or two occasions, he and his wife executed chattel mortgages on the live stock, machinery and growing crops thereon, to secure money borrowed for their personal use. The personal property was assessed and taxed as Hunnicutt's property. In the fall of 1903 a public sale was made of all the stock and crops upon the farm. The amount realized from the sale was about $2700, all of which was taken and kept by the wife. In the latter part of 1903 Mrs. Hunnicutt left Kansas and went to Indiana, and there died the next year, leaving her husband and her daughter, Gertrude, her only heirs. This action was commenced in March, 1905.

The first assignment of error argued is that the declarations of Mrs. Hunnicutt in her favor, as to the ownership of the land, are not competent as against Oren. These statements were made to a land agent at the time they were negotiating to sell 225 acres of the land. This was in 1900, some years after the recording of the deed from Hunnicutt and wife to Oren, during

which time Mrs. Hunnicutt had rented the land and
received the rent, as she claimed, as the agent of her
brother. The agent inquired of her: "How about the
title to this farm? I understand it is in your brother's
name." She said: "Yes, but we own the farm, and
whatever I say my brother will do, and we can make a
title. . . . I can make a title, and whatever I de-
cide on, Elihu, my brother, will agree to. He will do
whatever I say. There will be no trouble about making
the title to the farm." According to the claim of the
appellee, he and his wife owned the land all the time,
and were in possession of it, and she was receiving the
rent. The same contention was made and decided in
the case of *Butts v. Butts,* post, p 475. It was said in
that case:

"It is claimed that the court erred in permitting de-
fendants to offer in evidence certain declarations made
and letters written by W. C. Butts, long after the
date of the alleged gift, for the purpose of disproving
the gift. It is insisted that these declarations are
hearsay. The contention can not be sustained, as it
clearly appears from the evidence that the declarations,
were made and the letters written when W. C. Butts
was in the possession of the property, and his decla-
rations were admissible. (Citing numerous Kansas
cases supporting the proposition.)" (Post, p. 476.)

In this case the court did not err in admitting evi-
dence, on the theory as to the ownership of the party
offering the evidence. The court could not decide in
advance who owned the property; that was the very
subject of inquiry.

It is contended that the admissions of Mrs. Hunni-
cutt against her interest, and especially that by making
leases for renting the land and receipting for the rent
in her brother's name, would be binding upon her, and
are now binding upon Hunnicutt. The first branch of
this proposition—that her statements would have been
evidence against herself, if living—is undoubtedly
correct, but would not be conclusive except as to one

who had dealt with her relying thereon. The gravamen in this case is that Mrs. Hunnicutt and her brother, Oren, were in a conspiracy to get the property out of the hands of Hunnicutt, and that a part of the conspiracy was the renting and collecting of rent in the name of her brother. As before said, the court did not err in allowing the plaintiff to introduce evidence in support of his claim and on the theory of his claim.

It is also contended that fraud can not be presumed —that it must be proved, which, of course, is correct; but the court had a right to consider all of the surrounding circumstances. The court undoubtedly took into consideration that the inheritance of $5000 by Hunnicutt was the foundation upon which the fortune of the family was based. In addition, he drew a pension during all the years, and, it appears, worked industriously, although sometimes somewhat addicted to the use of intoxicating liquors. By the rise in the value of the property which he bought, and his labors, the value of the property increased, but at the end he had nothing; his brother-in-law had it all, or nearly all. With this view, the court was justified in scrutinizing every transaction suspiciously.

It is further contended that a judgment in favor of Mrs. Hunnicutt and against Oren, in an action brought by the agent, Atkinson, against them for a commission on the sale of 225 acres of the land, which he claimed to have negotiated and which they failed to consummate according to the arrangement, is binding on Hunnicutt, as a privy to Mrs. Hunnicutt, as to the ownership of the land. On the trial of that action Mrs. Hunnicutt in her testimony denied having any interest or ownership in the land, except as the tenant of Oren, and Oren claimed to be the owner thereof. Hunnicutt was not a party to that suit and the title to the land in question was not involved nor determined therein. This evidence, while competent, is not conclusive.

Again, it is contended that Hunnicutt transferred

30—84 KAN.

the title to the Missouri land and took the title to the
other property in his wife's name for the purpose of
defrauding his creditors, and that for that reason
he can not recover. There seems to be little com-
petent evidence to support the claim. Besides, his
conveyances of property to his wife are not set aside,
but he recovers one-half as an heir.

Sometime after Oren's return to Indiana, after the
recording of the deed to the land to him and of the
conversation between Hunnicutt, Oren and Mrs. Hun-
nicutt on the street, Oren executed three notes to Mrs.
Hunnicutt, one for $1000 and two for $900 each, and a
mortgage on the land to secure the payment thereof.
The execution of the notes by Oren to Mrs. Hunnicutt
and of the mortgage on the land as security were prop-
erly regarded by the court as not done in good faith,
although two of the notes were paid. They were evi-
dently paid from the proceeds of the farm. The one
for $1000, due for sixteen years, was never paid, but
apparently ignored. The same may be said of the deed-
ing of the land by Oren to Gertrude Hunnicutt, the
daughter, which deed she returned to Oren without
having it recorded, and which he destroyed. In view
of the finding of the court, which seems to be supported
by the evidence, that after awarding Hunnicutt and his
daughter the land Oren was still indebted to them in
excess of the taxes paid and money returned in the sum
of $1489.16, that these transactions were intended by
Oren and Mrs. Hunnicutt to deceive Hunnicutt and so
to shape matters that she would have the property
while she lived, and, if she died before Hunnicutt, he
would get no part of it, and that Hunnicutt knew noth-
ing of these transactions until after his wife's death,
the judgment holding them for naught seems legal and
equitable.

We have not traced in detail all of the facts, some of
which are claimed to indicate ownership in Oren and
some in favor of the Hunnicutts, but it appears from

the evidence and findings of the court that, upon the death of Mrs. Hunnicutt, her husband was left practically without any property, that the property which had been conveyed to Oren still stood in his name, and this action was brought to set aside that conveyance.

It is further contended that the claim of Hunnicutt is barred by laches and the statute of limitations. One-half of the property in question was awarded to Hunnicutt and one-half to the daughter, evidently as heirs of the deceased wife and mother. From the judgment in this case it must be assumed that the court found, as a proposition of law and fact, that Oren was holding the title to the land in trust for his sister, Rebecca S. Hunnicutt, at the time of her death. There was evidence to sustain such a finding, under the provisions of the third exception of section 9701 of the General Statutes of 1909 (Gen. Stat. 1868, ch. 114, § 8). When Hunnicutt, in June, 1890, discovered that the deed from himself and wife to Oren had been recorded without his consent, he immediately confronted them on the street and demanded of Oren that he place the title back where it was before the recording of the deed. To this Oren replied, in substance, that the ownership rested with the Hunnicutts, just as it did before the deed was executed; that all he had was just the legal title, but no ownership; that he did not claim any ownership—did not claim to be the owner; that the ownership rested just as it was before the deed was made— just as it had prior to the execution of this deed. He assured Hunnicutt that no harm would come to him from the deed's being recorded, as "Becky" [Mrs. Hunnicutt] wanted him to have it there and he would hold it for a while, at least; that he had not bought the place and that Hunnicutt's interest would be safe. This is evidence tending to show that by agreement between Mrs. Hunnicutt and her brother, Oren, confirmed in the presence of Hunnicutt, Oren was to hold the title in trust for her, and the circumstances all show that there

was no fraud in the transaction, unless it was against Hunnicutt. Hunnicutt had paid practically all of the consideration that had been paid for the land, and the conversation recognized that he had an interest therein, and the acquiescence of himself and his wife to the statement of Oren amounted to an agreement that Oren should hold the land in trust for them. In such a case the statute of limitations does not begin to run until there is a demand and a refusal to execute the trust or the trustee repudiates the trust to the knowledge of the beneficiary.

"Thus, even though the trust sought to be enforced is not an express trust, yet if it is one solely within the jurisdiction of a court of equity and is recognized and acknowledged by the person chargeable as trustee, it is not subject to the operation of the statute until it terminates or is repudiated by the trustee, according to the rule applying to express trusts. . . . Therefore, although the trust may in a sense be said to arise by implication, yet if it is not imposed upon the trustee by law and against his will, but is voluntarily assumed by him with the consent or at the request of the beneficiary, the statute will not run so long as he admits his obligations and makes no adverse claim." (25 Cyc. 1159.)

(See, also, 2 Perry, Trusts, 5th ed., note to § 865, p. 560; *Zunkel v. Colson,* 109 Iowa, 695.)

So long as the contract was being carried out, as it appears to have been until shortly before the death of Mrs. Hunnicutt, there was no reason for Hunnicutt or his wife to bring an action, and no laches could be charged against them.

The judgment is affirmed.